**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**THOMAS C. ALLEN**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RICHARD C. WEBSTER**
Deputy Attorney General
Indianapolis, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

| | | |
|---|---|---|
| SERGIO SANDOVAL, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 02A02-1111-CR-1113 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

---

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable John F. Surbeck, Jr., Judge
Cause No. 02D04-0906-FB-110

---

**September 18, 2012**


**MEMORANDUM DECISION - NOT FOR PUBLICATION**


**BROWN, Judge**

Sergio Sandoval appeals his conviction for neglect of a dependent as a class B felony.[1] Sandoval raises one issue, which we restate as whether the evidence is sufficient to sustain his conviction. We affirm.

The facts most favorable to Sandoval's conviction follow. In January of 2009, Sandoval lived with Brittney Shaw and their two daughters, A.S. and M.S., who was born on May 1, 2007, in a mobile home in Fort Wayne, Allen County, Indiana. On January 15, 2009, Sandoval filled a five-gallon bucket with hot water from the spigot for the washing machine hook up and poured the water into the bathtub in the bathroom. The mobile home's hot water heater had been set to its maximum temperature setting of 150 degrees. M.S. was immersed in the water and sustained extensive and second-degree burns.

M.S. was taken to the emergency room at Parkview Hospital. Sandoval initially reported to medical personnel that he was running bath water, that he left the room to obtain supplies and asked Shaw to watch M.S., that Shaw ignored him and went to watch television, and that M.S. had turned the water to hot and stepped in the tub. Emergency room physician Dr. John Winther examined M.S. and observed extensive burns on her feet and perineal area of the buttocks and prescribed morphine for M.S.'s pain. Sandoval reported to Dr. Winther that he was preparing a bath for M.S., that he had left both the hot and cold faucets on and had left the room, that he heard M.S. scream, that he returned to the bathroom to find M.S. squatting in the bathtub, and that he thought that M.S. had turned off the cold water and stepped into the bathtub. Dr. Winther considered M.S.'s

---

[1] Ind. Code § 35-46-1-4 (Supp. 2007) (subsequently amended by Pub. L. 6-2012, § 227 (eff. Feb. 22, 2012)).

2

burns to be significant and had M.S. transferred to the burn center at St. Joseph's Hospital in Fort Wayne. Dr. Winther also asked the nursing staff to contact the Department of Child Services ("DCS").

M.S. was treated at St. Joseph's Hospital by Dr. Kevin Berning, a plastic surgeon who treated patients in the hospital's burn center. A DCS intake family case manager took photographs of M.S.'s burns at St. Joseph's Hospital. M.S. remained at St. Joseph's Hospital until her discharge on January 26, 2009. Following her discharge from the hospital, M.S. received additional follow up treatment from the outpatient burn clinic at St. Joseph's Hospital.

Sandoval initially reported to police at St. Joseph's Hospital that he had been drawing a bath for M.S. while M.S. was standing looking over the tub, that he left to retrieve a towel, and that when he returned M.S. was standing in the tub and then sat down. Sandoval also stated that M.S. had turned off the cold water leaving only the hot water running. Several minutes later, Sandoval reported that he had left the bathroom to get a towel, heard M.S. scream, and returned to the bathroom to find M.S. already sitting in the bathtub. Sandoval provided a written statement that he went to retrieve a towel, that M.S. turned off the cold water and stepped inside the tub, and that M.S. was already sitting in the water by the time Sandoval returned.

During their investigation, police and the CPS case manager assigned to the case visited Sandoval's residence and observed that there was no handle for the hot water in the bathtub where M.S. received her burns. In a subsequent interview with a police detective, Sandoval stated that when he exited the bathroom to retrieve a towel there was

3

approximately one inch of water in the bathtub and that when he returned there was one and one-half to two inches of water in the tub. Sandoval also stated that approximately three years earlier the heating elements of the hot water heater had been replaced, that there was still insufficient hot water for a full shower or bath, and thus that the temperature of the hot water heater had been set to the maximum.

During the investigation, a police officer inspected the hot water heater and observed that the temperature was set at 150 degrees, which was the highest possible temperature setting. In examining the bathtub where M.S. received her burns, police again observed that no knob or fixture existed where the hot water knob would have been and that the handle or knob for the cold water was very difficult to turn and that a person would need to use a lot of force to turn it.

Also during their investigation, police took the temperature of the water in the bathtub at various intervals to determine how quickly the water heated up. Sandoval demonstrated to the officers the temperature and depth of the water at the time he exited the bathroom, which police determined to be approximately ninety-five degrees and one inch, respectively. Officers then turned off the cold water and determined that, after two minutes of running the hot water only, the temperature of the water in the bathtub was between approximately 98 degrees and 112 degrees at different locations in the tub. Officers continued to fill the bathtub with hot water until the water in the tub was approximately two inches deep and determined that the temperature of the water was 119 to 122 degrees at different locations in the tub. After fifteen minutes of running the hot

4

water only, the depth of the water was three and three-eighths inches deep and was 127.3 degrees.

In a subsequent interview with police, Shaw stated that the bathtub was not filled using the faucet as reported by Sandoval and that Sandoval had instructed her not to say how M.S. was really burned "because he didn't want to get in trouble." Transcript at 263. After police further questioned Sandoval and presented the information provided by Shaw, Sandoval informed police that he had filled a five-gallon bucket with water through the hot water spigot for the washing machine and poured the water into the bathtub. Sandoval also stated that Shaw was not in the area when the incident took place. Sandoval also stated to police that he spoke with Shaw about "getting their story straight" before he took M.S. to the hospital and "explained the water was blazing hot" and "didn't want them to look like dumb asses." Id. at 267.

Police recovered the five-gallon bucket which Sandoval used to fill the bathtub and asked Sandoval to fill the bucket and pour it into the bathtub the way he had done when he prepared a bath for M.S. The temperature of the water from the washing machine spigot was approximately 152 degrees. After Sandoval poured the water from the bucket into the bathtub, the depth of the water was one and one-quarter to one and one-half inches and the temperature of the water was approximately 136 degrees. After five minutes, the temperature of the water in the tub was approximately 132 degrees.

The State charged Sandoval with neglect of a dependent as a class B felony in January 2009, and the State filed an amended information in November 2009. At Sandoval's jury trial, the State presented testimony from, among others, Shaw, the DCS

case manager, the police detective and officers who were involved with the investigation, Dr. Winther, Dr. Kevin Berning, and Dr. Antoinette Laskey.

Dr. Winther testified that he observed that M.S. had suffered "significant symmetrical [] burns involving the feet and the perineal area of the buttocks." Id. at 141. Dr. Winther testified that the burns were "[a]t least second degree burns." Id. Pointing to a photograph of M.S.'s burn injuries, Dr. Winther directed the jury to the burn line and pointed out that "the reddened areas of the buttocks here are very symmetrical with a horizontal line and then both feet, kind of a stocking distribution going up the leg." Id. at 146. Dr. Winther testified that he did not notice any burns to M.S.'s hands or upper extremities and that he did not notice any splash marks on M.S.'s body at all. Dr. Winther testified as to the burns and blistering on M.S.'s feet and calf areas and as to the "line of demarcation" suggesting that "it appears that the child entered hot water in an upright position with the feet and legs drawn up . . . such that the lowest part[s] of the body that [were] in the water were the feet and the perineum and the buttocks." Id. at 146-147. Dr. Winther indicated that the lack of splash marks and burns on M.S.'s hands indicates "[a] very classic description of a dipping or emersion [sic] type of burn pattern." Id. at 147. Dr. Winther testified that he did not think that Sandoval's report regarding the manner in which M.S. received the burns was accurate as there were no splash marks or burns on M.S.'s hands and that if M.S. had entered the water on her own, she would have withdrawn or burned her hands "in an attempt to try to scramble and get out of the water." Id. at 148. Dr. Winther testified that M.S.'s burns were very consistent with the actions of "another person [taking] a child under the arms or by the hands and then

6

lower[ing] them into the water, to see these classic burn patterns." Id. at 149. When asked to elaborate on the burn pattern M.S. sustained, Dr. Winther testified that "as the feet go in the water, it's hot, so they withdraw because of pain and the legs go up and as the child is entered into the water, the hot water . . . level goes up to a kind of stocking distribution and because of the child trying to get away, withdrawal flexes up, the next part to enter the water is the buttock and perineum and then it goes to a certain level and then brought out of the water." Id. at 152.

Dr. Berning testified that M.S. suffered second-degree burns and that M.S. had burns over nearly fourteen percent of her total body surface area. Dr. Berning testified that M.S.'s hands were not burned and that he did not recall observing any splash marks. Dr. Berning testified that the version of events reported by Sandoval that M.S. climbed into the tub, turned off the cold water, and sat down before Sandoval could remove her was not consistent with M.S.'s injuries. Dr. Berning pointed to photographs presented to the jury and noted that "the line of demarcation where the injury occurs is pretty much a straight line" and that there were "no splash marks outside of the area." Id. at 206. When asked about the pattern of M.S.'s burns, Dr. Berning testified that it appeared that M.S. "had what we consider a dipping type injury" and explained that "when you have a child and you hold the child, dip them into liquid, that they would pull up their feet and you'd have a line of demarcation across the buttock area and generally the feet." Id. at 210. Dr. Berning indicated that M.S.'s burns were not consistent with M.S. standing in hot water and suddenly sitting down, in part because the pattern of injury shows that the feet were angled at some point and because of the lack of splash marks. Dr. Berning further

7

indicated that M.S.'s burns were not consistent with M.S. standing in cooler water and then turning off the cold water because in that case the child would have a layered effect of the injury which did not occur. Dr. Berning also indicated that M.S.'s burns were not consistent with M.S. climbing into the bathtub one foot at a time or sliding down into the tub, due to the consistencies of the burns on the feet and the lack of splash injuries.

Dr. Laskey, an associate professor of pediatrics at Indiana University School of Medicine who was board certified in child abuse pediatrics, consulted on M.S.'s case. Dr. Laskey testified that, based upon a temperature of the water in the bathtub of 136 degrees, the pattern of injuries was not consistent with M.S. standing in the tub and then sitting as that temperature would have been immediately painful and would have caused at a minimum a first degree burn. Dr. Laskey testified that an adult initially perceives pain at 119 degrees and that at 130 degrees it would take approximately thirty seconds to cause a burn that would cause blistering. Dr. Laskey testified that the temperature for a comfortable baby bath should be ninety-eight degrees. Dr. Laskey testified that immersion in water with a temperature of 136 degrees would cause second-degree burns in less than approximately thirty seconds and that M.S. would have experienced pain within seconds at that temperature. Dr. Laskey testified that M.S.'s burns were consistent with an adult caregiver picking her up and placing her in the water and not with stepping into the tub based on M.S.'s size and developmental capabilities. Dr. Laskey also testified that, given the nature of M.S.'s burns, she was in the water for approximately five to thirty seconds.

The jury found Sandoval guilty of neglect of a dependent as a class B felony. The trial court sentenced Sandoval to twelve years with ten years executed and two years suspended to probation.

The sole issue is whether the evidence was sufficient to sustain Sandoval's conviction for neglect of a dependent as a class B felony. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. Jordan v. State, 656 N.E.2d 816, 817 (Ind. 1995), reh'g denied. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. Id. We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. Id.

Sandoval contends that the evidence was insufficient to show that he knowingly placed M.S. in a situation that endangered the child's health. Sandoval argues that "whether the child was placed in the water by [him] or the child placed herself in the water while unsupervised the ultimate question is whether [Sandoval] knew that the water he had put into the bathtub was so hot as to burn the child." Appellant's Brief at 10-11. Sandoval asserts that "[t]here is little evidence [from] which a reasonable jury could infer that [he] knew that the hot water in the bathtub was hot enough to burn M.S." Id. at 11. Sandoval argues that visually cold water and hot water look the same, that he used water directly from the hot water heater which presumably was not a normal occurrence, that the water heater was turned to the highest setting of 150 degrees but this does not in any way suggest that he was aware that the water coming out at that temperature would be dangerous, that it would be hard for a reasonable jury to deduce that it is common

9

knowledge that 150 degree water is dangerous, and that although he later stated during the investigation that water was blazing hot this fact does not demonstrate that he was aware of the danger at the time of the injuries. Sandoval further argues that his attempt to mislead law enforcement on how M.S. was injured does not demonstrate guilt as it is readily possible that having accidentally hurt the child he was trying to avoid a case with DCS.

The State argues that the totality of the circumstances show that Sandoval had knowledge he was placing M.S. in a dangerous situation. The State asserts that Sandoval "was subjectively aware that the hot water was extremely hot because [he] had set the water temperature of the water heater at the maximum of 150 degrees" and that "it is reasonable to infer that [he] was aware for quite some time that the hot water was extremely hot." Appellee's Brief at 11. The State argues that there was sufficient evidence, both direct and circumstantial, to support Sandoval's conviction and that Sandoval's argument is merely an invitation for this court to reweigh the evidence and the credibility of the witnesses.

The offense of neglect of a dependent is governed by Ind. Code § 35-46-1-4, which at the time of the offense and the charging information provided in part under subsection (a) that "[a] person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally: (1) places the dependent in a situation that endangers the dependent's life or health . . . commits neglect of a dependent, a Class D felony." However, the offense is a class B felony if "it is committed under subsection (a)(1) . . . and results in serious bodily injury." Ind. Code

§ 35-46-1-4(b)(2). "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes serious permanent disfigurement, unconsciousness, extreme pain, permanent or protracted loss or impairment of the function of a bodily member or organ, or loss of a fetus. Ind. Code § 35-41-1-25. The amended charging information alleged that "Sandoval, having the care of M.S. . . . , a dependent, whether assumed voluntarily or because of a legal obligation, did knowingly or intentionally place M.S., in a situation that endangered her life or health, resulting in serious bodily injury . . . ." Appellant's Appendix at 79.

A person engages in conduct "intentionally" if, when he engages in the conduct, it is his conscious objective to do so. Ind. Code § 35-41-2-2(a). A person engages in conduct "knowingly" if, when he engages in the conduct, he is aware of a high probability that he is doing so. Ind. Code § 35-41-2-2(b); Villagrana v. State, 954 N.E.2d 466, 468 (Ind. Ct. App. 2011). Under the child neglect statute a "knowing" *mens rea* requires a subjective awareness of a "high probability" that a dependent has been placed in a dangerous situation. Villagrana, 954 N.E.2d at 468. Because, in most cases, such a finding requires the factfinder to infer the defendant's mental state, this court must look to all the surrounding circumstances of a case to determine if a guilty verdict is proper. Id.

A review of the evidence most favorable to Sandoval's conviction indicates that on January 15, 2009, Sandoval had care and control of M.S., his dependent. Sandoval does not contest that M.S. sustained severe burns as a result of being immersed in or coming into contact with hot water in the bathtub, which Sandoval had obtained from a

11

hot water spigot for a washing machine where the hot water heater was set to the maximum temperature of 150 degrees. The singular dispute was whether the injuries were inflicted knowingly or intentionally rather than accidentally.

At trial, the State presented the testimony of Dr. Winther, Dr. Berning, and Dr. Laskey, and each testified that the nature, pattern, and distribution of M.S.'s burn injuries, including the nature of the line of demarcation and the lack of splash marks outside the burn area or upper extremities, was consistent with Sandoval lowering M.S. into the hot water and was inconsistent with M.S. entering the water of her own accord. In addition, the State presented testimony that M.S. would have experienced pain within seconds of being placed in the hot water and that, in order for M.S. to sustain her injuries, M.S. must have been immersed in the hot water for approximately five to thirty seconds. Further, the State presented photographs of the bathroom, bathtub, the bathtub fixtures, and numerous photographs showing M.S.'s multiple burn injuries together with the physicians' testimony explaining the nature and pattern of burns revealed in those photographs.

A jury could have reasonably found from the evidence presented at trial that Sandoval knowingly placed M.S. in a situation that endangered M.S.'s life or health and that the placement resulted in serious bodily injury to M.S. Based upon the evidence most favorable to the conviction, we conclude that sufficient evidence exists from which the jury could find Sandoval guilty beyond a reasonable doubt of neglect of a dependent as a class B felony. See Taylor v. State, 644 N.E.2d 612, 613-614 (Ind. Ct. App. 1994) (holding that the State presented credible evidence supporting the judgment that the

12

defendant intentionally immersed the face of a four-month old child in scalding water, resulting in burns, and noting that the evidence showed that the burns were not consistent with splash burns because of the uniform depth of the burns and not consistent with the defendant's testimony that the child's injuries were the result of an accident); Sipress v. State, 562 N.E.2d 758, 759-760 (Ind. Ct. App. 1990) (holding that a reasonable trier of fact could infer that the defendant knowingly placed his child in a situation which might and in fact did endanger her life and health, observing that the State presented evidence that the clear line of demarcation between the unburned and burned skin indicated that the injury was caused by an immersion or a non-accidental pour and was not the result of an accidental or splash-type injury and noting that the defendant's conviction may be supported by circumstantial evidence alone), reh'g denied.

For the foregoing reasons, we affirm Sandoval's conviction for neglect of a dependent as a class B felony.

Affirmed.

FRIEDLANDER, J., and PYLE, J., concur.